## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TRACEY RIDOLFI,** | : | **Civil No. 1:15-CV-859** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **STATE FARM MUTUAL** | : | |
| **AUTOMOBILE INSURANCE** | : | |
| **COMPANY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.     Introduction

This is an insurance dispute between Tracey Ridolfi and her insurer, State
Farm Mutual Automobile Insurance Company, relating to claims concerning State
Farm's alleged refusal to provide underinsured motorist (UIM) coverage to Ridolfi.
Ridolfi's second amended complaint, (Doc. 21), the operative pleading in this
action, brought two claims against State Farm: First, Ridolfi alleged that State
Farm's conduct constitutes a breach of this insurance contract. In addition, Ridolfi
contended that State Farm handling of this particular insurance claim violated
Pennsylvania's insurance bad faith statute, 42 Pa. Cons. Stat. Ann. § 8371.

We do not write on a blank slate in this litigation. Quite the contrary, there
has been extensive litigation in this case, (Docs. 1-106), including a ruling by the

court on a defense motion for partial summary judgment which found as a matter of law that a statutory insurance bad faith claim did not lie here. (Docs. 50, 51.)

One might have thought that this summary judgment ruling resolved the issue of whether any bad faith claim could be tried by Ridolfi against State Farm. This was certainly our initial impression. However, as we prepared for the trial of this case, it became apparent that the parties had two very different perspectives on this issue. For her part, Ridolfi acknowledged our ruling on her statutory bad faith claim, but persisted in the view that she should be able to present the same evidence in support of a common law breach of contract claim which she argued rested upon a common law contractual duty of good faith and fair dealing. Not surprisingly, State Farm took a contrary view, contending that no bad faith claim—statutory or contractual—lies here. In order to allow all parties the opportunity to fully develop and address this issue, we re-opened motions practice in this case in order to allow for the filing of a supplemental summary judgment motion relating to any contractual bad faith claims. (Doc. 98.)

State Farm has filed such a partial summary judgment motion, (Doc. 100), seeking summary judgment in its favor on any contractual bad faith claim. This motion is fully briefed by the parties, (Docs. 103-106), and is, therefore, ripe for resolution.

For the reasons set forth below, this motion for summary judgment will be GRANTED.

## II.    Statement of Facts and of the Case

As we have previously noted, the chain of events which led to this lawsuit began on October 26, 2008, when Tracey Ridolfi was involved in an automobile accident with a tortfeasor who was insured by Liberty Mutual Insurance Company. Following this collision, Ridolfi filed a claim with the tortfeasor's insurance carrier, Liberty Mutual.

Ridolfi also notified her insurance carrier, State Farm, of this accident. State Farm had previously issued an automobile insurance policy to Ridolfi and her spouse in 2004 and at the time that the policy was issued there was some latent confusion regarding the scope of Ridolfi's UIM coverage under the policy. This confusion stemmed from some mutual mistakes and oversights by both parties at the time that this policy was issued. When the plaintiff and her husband applied for this insurance policy in August of 2004, it is undisputed that their insurance policy application specified that they were seeking UIM coverage of $50,000 per person and $100,000 accident from State Farm. (Doc. 47, pp. 15-16.) Further, it appears that State Farm only billed the Ridolfis for $50,000/$100,000 in UIM coverage with policy stacking benefits. Yet, while the plaintiff only requested $50,000/$100,000 in

UIM coverage, the sign down form issued by State Farm provided for a higher level of UIM coverage $100,000/$300,000. (Doc. 103, ¶28.) The internal inconsistency between what the plaintiff requested, and the greater level of coverage that she received, created some brief confusion when Ridolfi first lodged a claim against State Farm in 2013, but remained undetected by Ridolfi or State Farm for many years.

Ridolfi's insurance contract with State Farm also specifically provided that if the parties could not agree upon the amount of damages attributable to the negligence of an under-insured motorist, "then the Insured shall . . . file a lawsuit in a state or federal court that has jurisdiction, against" State Farm and the under-insured motorist. Thus, the instant lawsuit followed precisely the procedure that was contemplated and called for under the contract between Ridolfi and State Farm. (Doc. 103-2, p. 44.)

Following notification of Ridolfi's October 26, 2008 accident with an under-insured motorist, Ridolfi's counsel exchanged correspondence with State Farm seeking information regarding medical bills paid out by State Farm on Ridolfi's behalf in January of 2009, but there is no record of Ridolfi making any specific demand upon State Farm for payment of UIM benefits prior to August 2013.

Instead, the initial focus of Ridolfi's efforts to obtain compensation for her

injuries appears to have been with the tortfeasor and the tortfeasor's insurance carrier, Liberty Mutual. As part of this effort, on October 20, 2010, Ridolfi filed a lawsuit against the original tortfeasor, alleging that she was injured as a result of the tortfeasor's negligence. After nearly four years of litigation, on September 15, 2014, Ridolfi settled this claim against Liberty Mutual, compromising the claim in return for the payment of $85,000, a sum which was less than the full amount of the tortfeasor's policy limits with Liberty Mutual, $100,000. State Farm consented in this settlement and waived any subrogation rights it might have as part of the settlement of this lawsuit.

Instead, the first notice State Farm received of Ridolfi's intent to also bring a UIM coverage claim against her own insurer came on August 28, 2013, when Ridolfi's counsel wrote to State Farm. In this August 28, 2013 correspondence Ridolfi's counsel "put [State Farm] on notice that this case may involve a UM/UIM potential claim." In this August 2013 correspondence, Ridolfi's counsel also sought policy limits and coverage information from State Farm. Three weeks later, on September 20, 2013, State Farm's claims adjuster responded to this notice by providing Ridolfi's attorney a letter which stated that the UIM coverage under Ridolfi's policy was $50,000/$100,000 with stacking coverage. In this September 20 letter State Farm also invited Ridolfi's counsel to advise the insurer if he disagreed

with this policy limits report. In fact, this policy limits description was erroneous but the error was, in part, a product of confusion which stemmed from inconsistencies between the coverage sought by the Ridolfis, and the coverage actually conferred upon them by State Farm. The coverage limits described in State Farm's September 20, 2013 letter accurately described the policy limits requested in the Ridolfis' 2004 insurance application. However, in fact, the policy issued to the plaintiff and her spouse conferred UIM coverage to them beyond the coverage which they requested. The actual amount of this coverage was $100,000 per person and $300,000 per accident.

On November 5, 2013, Ridolfi's attorney notified State Farm of this discrepancy in a letter which conveyed a $700,000 demand upon State Farm, and threatened the filing of a statutory bad faith claim against this insurance company.[1] Having received this November 5, 2013 correspondence, State Farm promptly responded, declining Ridolfi's $700,000 settlement demand—a demand which was $500,000 in excess of the policy limits—but reforming and clarifying the scope of

---

[1] In April of 2014 Ridolfi subsequently amended this settlement demand to a demand for the full amount of State Farm's UIM coverage, $200,000. This amended settlement demand, however, was cast in terms which were simply not conducive to further discussion, since Ridolfi's counsel informed State Farm that this policy limits demand was non-negotiable. Ridolfi's lawyer's letter then gave State Farm 15 days in which to surrender its policy limits or face bad faith claims.

its coverage and confirming UIM policy coverage of $100,000 per person and $300,000 per accident on each of two vehicles. Thus, State Farm corrected this coverage policy limit confusion within the span of two months, and provided this complete and accurate policy limit information to Ridolfi and her counsel 10 months prior to their settlement of the underlying tort case against the allegedly under-insured motorist, and 18 months prior to the filing of this lawsuit.

As the parties strived to clarify these policy limitations, they also began exchanging requests for information regarding the nature and extent of Ridolfi's medical care and treatment. State Farm's efforts to fully document Ridolfi's injuries and medical expenses were both understandable and prudent given the various demands which had been tendered to this insurer by counsel, demands which initially sought $700,000 and then later included what was described as a non-negotiable demand for State Farm's UIM insurance policy limits. These efforts to secure medical records were marked by some delays and confusion; however, those delays and confusion were not attributable exclusively to State Farm. Rather, they reflected a confluence of events, including some misunderstanding and mistakes on the plaintiff's part. Initially, on November 5, 2013, plaintiff's counsel reported that he was sending all of Ridolfi's medical records to State Farm. After State Farm was unable to confirm receipt of these records, the claims adjuster wrote

to counsel requesting documentation of Ridolfi's medical records on November 22, 2013.

When these medical records were not forthcoming, State Farm's claims adjuster followed up on January 3, 2014, once again requesting these medical records. The claims adjuster then reached out to Ridolfi's counsel on January 7, 2014, and explained that State Farm had only received a single April 2012 medical report relating to the plaintiff. At this juncture, Ridolfi's counsel forwarded, and State Farm received, medical records from fifteen health care providers.

These records, however, were incomplete in several particulars. First, the medical files did not include any records detailing Ridolfi's physical condition prior to the October 2008 accident. Second, the temporal scope of the records was limited in another respect in that the disclosed records did not include any treatment records relating to medical care that Ridolfi received after March of 2012. Finally, the medical records did not include any records pertaining to prior accidents involving Ridolfi. This oversight was understandable, since Ridolfi's counsel had previously been unaware of any prior accidents.

Throughout March and April of 2014 State Farm and Ridolfi's counsel continued to exchange correspondence regarding State Farm's request for medical records. While the parties communicated with one another it is apparent that they did

not fully understand one another. State Farm avers that it was seeking to obtain specific additional and supplemental material, and its correspondence seeks medical records, but does not identify specifically what further records were being sought. Ridolfi's counsel, in turn, simply repeated that he has provided the medical records, without appreciating that State Farm was seeking documents beyond those produced in January of 2014.

The need for further medical records became more apparent as this matter progressed. In April 2014, State Farm retained counsel to assist in the resolution of this claim. As part of this claims resolution effort, counsel scheduled a sworn statement from Ridolfi on June 19, 2014. While Ridolfi alleges that this act by State Farm evidenced its bad faith, the scheduling of this statement under oath was a procedure that was specifically authorized under Ridolfi's policy with State Farm, and was an appropriate measure given the scope of her insurance claim demands made here.[2] In the course of the statement under oath, Ridolfi testified to matters

---

[2] Ridolfi has also suggested in the past that taking this sworn statement was improper because State Farm had been invited in February of 2012 to attend a deposition of the plaintiff conducted in connection with her lawsuit against the original tortfeasor. While State Farm denies that it was invited to this deposition, even if it had been invited to attend this deposition in a case in which it was not a party, for the reasons discussed below, we conclude that the failure to attend this deposition does not evidence bad faith. First, given State Farm's status as a non-party, it is doubtful that this company could have participated in the deposition in any meaningful fashion. Second, the deposition took place some 16 months prior to the first notice by Ridolfi

which renewed State Farm's interest in obtaining further medical records. Specifically, Ridolfi testified that she had received medical treatment after March of 2012, the last date upon which plaintiff's counsel had produced medical records. In addition, Ridolfi acknowledged that she had suffered injuries from a prior motor vehicle accident.

Given these disclosures by Ridolfi, State Farm pursued additional efforts to secure further medical records, including several attempts to subpoena these records. These efforts were marked by some missteps and miscommunication between the parties, but ultimately resulted in the receipt of some additional, previously undisclosed medical records, information that was relevant to State Farm's evaluation of Ridolfi's $700,000 claim and settlement demand.

Indeed, the recent litigation history of this case disclosed that, even as this case was prepared to proceed to trial, material gaps remained in Ridolfi's medical disclosures to State Farm. These shortcomings in the plaintiff's medical disclosures were highlighted by a June 2017 motion *in limine* (Doc. 65), which sought to preclude Ridolfi from alluding to an EMG/nerve conduction test which she allegedly

---

that she intended to bring a UIM claim against State Farm. This insurers' lack of prescience and inability to predict the future does not equate to bad faith. Third, even if State Farm had attended this deposition in February of 2012, by 2014 it would still have been justified in requiring a statement under oath from Ridolfi, who was demanding a policy limits payment from her insurer, in order to document the scope and extent of her injuries and treatment since 2012.

underwent on the grounds that this medical examination was never disclosed in the course of discovery.

State Farm also sought employment records from Ridolfi as part of its evaluation of this claim. While Ridolfi has alleged that these requests were irrelevant to her UIM claim, it appears that plaintiff's counsel had suggested on several occasions that Ridolfi's future employability was uncertain, and had indicated that Ridolfi might be making a claim for loss of future earnings, assertions which made an assessment of Ridolfi's employment history relevant to any claims evaluation.

As the parties engaged in these efforts, Ridolfi continued to litigate a claim against the tortfeasor's insurance carrier, Liberty Mutual. That underlying claim was not resolved until September 15, 2014, when Ridolfi settled this claim against Liberty Mutual, compromising the claim in return for the payment of $85,000, a sum which was less than the full amount of the tortfeasor's policy limits with Liberty Mutual, $100,000.

It is against this factual background that we now consider Ridolfi's common law, contractual bad faith claim, having previously dismissed a parallel statutory bad faith claim which relied upon an identical factual showing. For the reasons set forth below, State Farm's motion for summary judgment on this common law contractual bad faith claim will be granted, and Ridolfi's bad faith claim will be dismissed.

## III.    Discussion

### A.    Summary Judgment Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Id.* (quoting *Anderson*, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof.  *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  Provided the moving

party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings. *See Martin v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007); *see also* Fed. R. Civ. P. 56 (c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, *Anderson*, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. *Id.* Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id.* at 252; *see also Big Apple BMW*, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent
> need not match, item for item, each piece of evidence

> proffered by the movant.  In practical terms, if the
> opponent has exceeded the "mere scintilla" threshold and
> has offered a genuine issue of material fact, then the court
> cannot credit the movant's version of events against the
> opponent, even if the quantity of the movant's evidence
> far outweighs that of its opponent.  It thus remains the
> province of the factfinder to ascertain the believability and
> weight of the evidence.

*Id.*  In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); *NAACP v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011).

### B.    <u>Plaintiff's Common Law, Contractual Bad-Faith Claim Fails on its Merits</u>.

In this case, we have found that Ridolfi's statutory bad faith claim fails as a matter of law on the undisputed evidence before us. Undeterred, Ridolfi has endeavored to re-frame and re-package this claim as a common law breach of contractual duty of good faith claim, which she wishes to tender to the jury.

While we acknowledge that in Pennsylvania, a duty of good faith and fair dealing is implicit in all insurance contracts,  *Condio v. Erie Ins. Exch.,* 899 A.2d 1136, 1144 (Pa. Super. Ct. 2006) (citing *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 905 (1999)), we find on the facts presented here that this particular bad faith

claim fails as a matter of law regardless of how it is characterized by Ridolfi.

Pennsylvania law appears to recognize a cause of action to enforce a contractual

obligation of good faith, and in some instances permits insureds to recover

compensatory damages for an insurer's failure to act in good faith. *See Benevento*

*v. Life USA Holding, Inc.,* 61 F. Supp. 2d 407, 425 (E.D. Pa. 1999); *see also Birth*

*Center v. St. Paul Cos.,* 787 A.2d 376, 385-86 (Pa. 2001) (in the context of a

third-party case in which an insurer refused to settle a claim on behalf of the insured,

holding that "nothing [in Pennsylvania case law] bars a party from bringing a bad

faith action sounding in contract from recovering damages that are otherwise

unavailable to parties in contract actions . . . ."); *Gray v. Nationwide Mut. Ins. Co.,*

223 A.2d 8, 11 (Pa. 1966) (common law breach of contract action recognized for

insurer's failure to comply with obligation to act in good faith in representing the

interests of the insured in failing to settle with a third party).

However, "Pennsylvania does not recognize a separate breach of contractual

duty of good faith and fair dealing where said claim is subsumed by a separately pled

breach of contract claim." *Simmons v. Nationwide Mut. Fire Ins. Co*., 788 F. Supp.

2d 404, 409 (W.D. Pa. 2011) (citing *LSI Title Agency, Inc. v. Evaluation Servs., Inc*.,

951 A.2d 384, 391 (Pa. Super. Ct. 2008))); *Ross v. Metropolitan Life Ins. Co.,* 411 F.

Supp. 2d 571, 583-84 (W.D. Pa. 2006) (dismissing breach of fiduciary duty claim as

redundant of the plaintiff's claim for breach of contract). It appears that courts have applied this rule in cases involving first-party claims for insurance benefits and have concluded that in such cases, a claim for breach of the duty of good faith and fair dealing merges with the plaintiff's claim for breach of contract where the claims arise out of the same alleged conduct on the part of the insurer. *See, e.g., Simmons,* 788 F. Supp. 2d at 409; *Meyer v. Cuna Mut. Group,* 2007 WL 2907276, at *15 (W.D. Pa. Sept. 28, 2007); *Lutz v. Lutz,* 2016 WL 5848856, at *3 (E.D. Pa. Oct. 6, 2016) (finding that a breach of duty of good faith and fair dealing was subsumed in separately pleaded breach-of-contract claim); *Zaloga v. Provident Life & Accident Ins. Co. of Am.*, 671 F. Supp. 2d 623, 631 (M.D. Pa. 2009) ("There is . . . no independent cause of action for a breach of the covenant of good faith and fair dealing – arising in contract – in Pennsylvania because such a breach is merely a breach of contract."); *JHE, Inc. v. Se. Pa. Transp. Auth.,* 2002 WL 1018941, at *5 (Phila. C.P. May 17, 2002) ("[T]he implied covenant of good faith does not allow a claim separate and distinct from a breach of contract claim. Rather, a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself."); *Garvey v. National Grange Mut. Ins. Co.,* No. 95-0019, 1995 WL 115416, at *4 (E.D. Pa. March. 16, 1995).

Thus, as a legal matter, "[t]here are two separate 'bad faith' claims that an insured can bring against an insurer: a contract claim for breach of the implied contractual duty to act in good faith and with fair dealing [-a common law bad faith contract claim-], and a statutory bad faith tort claim under 42 Pa. Cons. Stat. Ann. Section 8371." *Tubman v. USAA Cas. Ins. Co.*, 943 F. Supp. 2d 525,529 (E.D Pa. 2013) (quoting *Birth Center v. St. Paul Cos., Inc*., 787 A.2d 376, 390 ( Pa. 2001 )) (Nigro, J. concurring). However, a common law contractual bad faith claim is "subsumed by the breach of contract claim. . . . because 'the actions forming the basis of the breach of contract claim are essentially the same actions forming the basis of the bad faith claim.'" *Tubman v. USAA Cas. Ins. Co.,* 943 F. Supp. 2d 525, 529 (E.D. Pa. 2013). Therefore, " 'Under Pennsylvania law, the implied covenant of good faith does not allow for a cause of action separate and distinct from a breach of contract claim.' *Burton v. Teleflex Inc.,* 707 F.3d 417, 431 (3d Cir. 2013). Consequently, the covenant of good faith does not apply to all of a party's dealings with a contractual partner but only to the partner's performance of duties that specifically arise out of their contract. *Id.; Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 91–92 (3d Cir. 2000)." *Silvis v. Ambit Energy L.P.,* 674 F. App'x 164, 168 n. 7 (3d Cir. 2017). The legal and factual similarity of common law contractual and statutory bad faith claims affects the legal analysis of these

claims in one other salient way. When the same precise course of conduct forms the basis of contractual and statutory bad faith claims, courts have suggested that these legally and factually identical claims should be treated together. *See Bodnar v. Nationwide Mut. Ins. Co.,* No. 3:12-CV-01337, 2015 WL 5517922, at *10-13 (M.D. Pa. Sept. 15, 2015), *reconsideration denied sub nom. Bodnar v. Amco Ins. Co*., No. 3:12-CV-01337, 2015 WL 7863089 (M.D. Pa. Dec. 3, 2015), *aff'd,* 660 F. App'x 165 (3d Cir. 2016).

Applying these benchmarks we find that any separate contractual bad faith claim made by Ridolfi in this case is subsumed by the terms of the contract itself. We further conclude based upon the law of the case, and our second, separate and independent review of the uncontested facts that a bad faith claim simply does not like here, regardless of how Ridolfi wishes to cast that claim of bad faith. Indeed, this claim fails for a number of reasons.

First, the renewal of this bad faith claim in the guise of a contractual bad faith claim in our view runs afoul of the law of the case doctrine in this case where we have already rejected a factually identical statutory bad faith claim. "Under the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances. . . . . The purpose of this doctrine is to promote the 'judicial system's interest in finality and in efficient administration.

*Todd & Co., Inc. v. S.E.C.,* 637 F.2d 154, 156 (3d Cir. 1980).' " *Hayman Cash*

*Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1981). The contours of this

settled doctrine have been described by the United States Court of Appeals for the

Third Circuit in the following terms:

> In *Arizona v. California,* 460 U.S. 605 (1983), the Supreme Court
> noted:
>
>> Unlike the more precise requirements of res judicata, law of
>> the case is an amorphous concept. As most commonly
>> defined, the doctrine posits that when a court decides upon a
>> rule of law, that decision should continue to govern the
>> same issues in subsequent stages in the same case.
>
> Id. at 618 (citations omitted). The "[l]aw of the case rules have developed
> 'to maintain consistency and avoid reconsideration of matters once
> decided during the course of a single continuing lawsuit.'"

*In re Pharmacy Benefit Managers Antitrust Litigation*, 582 F.3d 432, 439 (3d

Cir.2009)(reversing arbitration order in antitrust case on law-of-the-case

grounds)(citations omitted). It is clear that "[t]he ... doctrine does not restrict a

court's power but rather governs its exercise of discretion*." Id. (quoting Pub.*

*Interest Research Group of N.J., Inc. v. Magnesium Elektron Inc.,* 123 F.3d 111, 116

(3d Cir.1997)) (citations omitted). In exercising that discretion, however, courts

should "be loath to [reverse prior rulings] in the absence of extraordinary

circumstances such as where the initial decision was clearly erroneous and would

make a manifest injustice." *Id.( quoting Christianson v. Colt Indus. Operating*

*Corp.,* 486 U.S. 800, 816 (1988)). In addition to that narrow class of cases where the prior ruling was manifestly unjust, the type of "extraordinary circumstances" that warrant a court's exercising its discretion in favor of reconsidering an issue decided earlier in the course of litigation typically exist only where (1) new evidence is available, or (2) a supervening new law has been announced. *Id.* (*citing, Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997)).

In the instant case, we find that none of the exceptions to the law of the case doctrine apply here. First, we are provided with no new evidence which would compel a different result here. Instead, the evidence seems to continue to show that State Farm gave the Ridolfis greater insurance coverage than they requested at a reduced premium rate, but briefly misstated the scope of that coverage, describing the coverage as that initially sought by Ridolfi and not as the higher level of coverage actually provided by this insurer. When this discrepancy was brought to its attention, State Farm promptly reformed its policy to provide the Ridolfis with that greater level of coverage and potential recovery. As a factual matter there is simply nothing about the fact that State Farm provided greater coverage to Ridolfi than that requested, or paid for, by the plaintiff which would permit an inference of bad faith. Nor does this apparently undisputed course of events constitute a set of

circumstances which makes a denial of a bad faith claim manifestly unjust. Finally, no one points us to a supervening change in the law which would call for a different outcome in this case. Since Ridolfi does not provide a legal or factual justification to depart from the law of the case, her request to pursue this claim, which invites us to discount the law of the case doctrine, should be denied.

More fundamentally, we continue to believe that this bad faith claim should be dismissed because the uncontested facts simply do not permit a reasonable inference of bad faith on the part of State Farm in this case. In assessing the reasonableness of State Farm's conduct in this case, we observe that certain essential facts are undisputed. This case involves an under-insured motorist policy claim against State Farm. Thus, the liability of State Farm was contingent upon a determination of the liability of the original tortfeasor, and an assessment of whether the policy limits on the original tortfeasor's insurance policy rendered that tortfeasor under-insured. Given these contingencies, a determination of whether a valid under-insured motorist claim exists often must await factual and legal developments in the underlying claim against the original tortfeasor. This process necessarily can create some delay in claims adjustment, delays that are not evidence of bad faith but simply reflect the process of careful claims evaluation.

So it is in this case. Ridolfi was injured in October of 2008 in an accident with

the original tortfeasor, who was insured by Liberty Mutual. While Ridolfi initially

placed both the tortfeasor and her own insurer on notice of this accident by 2009,

Ridolfi's initial efforts were justifiably focused on her claim against the original

tortfeasor and that tortfeasor's insurance carrier. Those efforts were pursued in

earnest in 2010, when Ridolfi filed her lawsuit against the tortfeasor in state court

and these state court proceedings were protracted. Indeed, it is undisputed that

Ridolfi did not resolve this underlying claim, which serves as the legal and factual

predicate for her UIM claim, until September of 2014. Furthermore, when Ridolfi

ultimately resolved this claim with the insurer of this allegedly under-insured

tortfeasor she did so for a sum that was below that tortfeasor's policy limits. While

this tactical litigation choice may well have been justified, the settlement of the

underlying claim against what one alleges to be an under-insured motorist for less

than the policy limits certainly raises questions concerning the extent to which

Ridolfi's own insurer has an obligation to make further payments to her under its

under-insured motorist insurance coverage. Indeed, oftentimes it is both prudent and

reasonable for a UIM insurer to await some determination of liability and damages

in the underlying tortfeasor case before trying to make an informed assessment of

any UIM claim. *See Walter v. Travelers Pers. Ins. Co.*, No. 4:12-CV-346, 2016

WL 6962620, at *6 (M.D. Pa. Nov. 29, 2016) ("it was reasonable for [the insurer] to

await a determination regarding whether [the insured's] injuries exceeded the . . . primary insurance coverage thresholds under the [primary] policy, before resolving its UIM claim.")

These considerations inform our analysis of Ridolfi's bad faith-delay argument in this case. On this score, we believe that August 28, 2013, is the earliest date which may serve as the starting date for assessing the reasonableness of any claims processing delay in this case. That date is the date upon which Ridolfi's counsel placed State Farm on notice of a potential UIM claim, and the very language used by counsel to notify State Farm of this potential claim underscores why it would be inappropriate to measure alleged delay from any earlier date. In this August 28, 2013 correspondence Ridolfi's counsel simply stated that Ridolfi was "put[ting] [State Farm] on notice that this case *may* involve a *UM/UIM potential claim*." (emphasis added.) Thus, even in August of 2013, Ridolfi's notice to State Farm was contingent and equivocal, since it simply indicated that a potential UIM claim may exist.  Given Ridolfi's own guarded characterization of this claim in August of 2013, it cannot be said that Ridolfi can show that State Farm should have recognized this UIM claim four years earlier in 2009. Indeed, this court has in the past held that the date upon which a plaintiff clearly notifies an insurance carrier of a potential UIM claim serves as the most appropriate benchmark for measuring delay

in evaluating that claim, notwithstanding prior communications between the parties. *Shaffer v. State Farm Mut. Auto. Ins. Co.*, No. 1:13-CV-01837, 2014 WL 5325340, at \*7 (M.D. Pa. Oct. 20, 2014), *aff'd*, 643 F. App'x 201 (3d Cir. 2016).

Once this claim was made by Ridolfi's counsel, the parties engaged in an on-going process aimed at attempting to resolve this claim. These efforts were unsuccessful but that lack of success, standing alone, does not demonstrate bad faith. Quite the contrary, even when we construe the evidence in a light most favorable to the plaintiff, we find that this claims processing chronology reflects a confluence of events and actions, and that in some instances the plaintiff's own actions contributed to some of these delays. In reaching this conclusion, we are constrained to assess this legal issue in the undisputed factual context of this case, where once State Farm was placed on notice of Ridolfi's potential claim it received two settlement demands, one in November of 2013 for $700,000, and a second non-negotiable demand in April of 2014 for the full UIM policy limits, $200,000. Neither of these demands was reasonably calculated to promote a settlement of this claim. Quite the contrary, given the dimensions of these demands, prudence dictated a careful review of this claim, and it appears that State Farm undertook such a review.

In the course of this review, State Farm promptly, but erroneously, initially identified the UIM policy limits as $50,000/$100,000 in September of 2013. While

Ridolfi continues to rely upon this error as her primary ground for claiming bad faith on State Farm's part, we note that the undisputed evidence provided ample basis for this original, and erroneous, report since the Ridolfis' insurance application actually sought this lower level of coverage, but State Farm underwrote a policy which gave the plaintiff more UIM coverage than she had requested. Moreover, when this discrepancy was identified by plaintiff's counsel, State Farm promptly reformed its policy coverage position in November of 2013, to accurately state greater policy limits of $100,000/$300,000. Thus, the policy limits were revised and corrected by State Farm long before Ridolfi made her policy limits demand upon State Farm and these policies limits were correctly understood by all parties some ten months prior to the settlement of the underlying claim against the original tortfeasor. On these facts, the brief delay and confusion regarding policy limits simply cannot be seen as proof of some actionable bad faith self-dealing by State Farm which would support a separate legal claim in this case.

Nor do we find that State Farm's insistence upon obtaining a statement under oath from Ridolfi in June of 2014 was evidence of bad faith. On this score, it is entirely undisputed that State Farm has the right to insist upon such a statement from Ridolfi under its contract of insurance with the plaintiff. Indeed, securing such statements is not uncommon in these cases, and is typically not regarded as evidence

of bad faith. *See Shaffer v. State Farm Mut. Auto. Ins. Co.*, No. 1:13-CV-01837, 2014 WL 5325340 (M.D. Pa. Oct. 20, 2014), *aff'd*, 643 F. App'x 201 (3d Cir. 2016). Furthermore, by the time that State Farm took this statement from Ridolfi, it was confronted by two significant demands from the plaintiff, demands which warranted a careful evaluation of her injuries, losses and claims. Moreover, the medical information State Farm possessed was limited in some respects since it did not include medical information pre-dating the accident; nor did it encompass medical records after March of 2012. Thus, at the time of this statement in June 2014, there was a two-year gap in the medical information available to State Farm, information which was important to a fully informed assessment of this policy limits demand and an overall evaluation of the case.

Likewise, the manner in which the parties obtained and exchanged medical records in our view continues to fall well short of any actionable showing of bad faith even when considered in a light most favorable to Ridolfi. As we have noted this process was marked by missteps, delays and confusion by all parties, however, some of those difficulties and delays are attributable, at least in part, to the plaintiff. For example, between November 2013 and January 2014, there was an initial delay between Ridolfi's counsel and State Farm in ensuring that State Farm had received those records that were in plaintiff's possession. This initial confusion contributed to

several months delay in evaluating this claim, but the evidence does not allow a finding of bad faith on State Farm's part. Quite the contrary, after State Farm was unable to locate the records which plaintiff's counsel believed he had forwarded to this insurer in November of 2013, State Farm took the initiative to pursue this matter with counsel in January of 2014, writing and calling counsel to obtain these records. Furthermore, once receipt of these records revealed gaps in medical information, both preceding the 2008 accident, and after that accident from March 2012 forward, State Farm was justified in undertaking efforts to secure this additional medical information. Indeed, the reasonableness of State Farm's conduct in this regard is underscored by the fact that, despite their diligent and persistent efforts to acquire all relevant medical information, Ridolfi has still alluded to undisclosed care, testing and treatment as this case proceeded to trial, including an EMG/nerve conduction test which she allegedly underwent but never disclosed in the course of discovery. (Doc. 65.)

Finally, we conclude on the facts of this case that there is one other, insurmountable legal hurdle to any contractually-based bad faith claim in this case. Recognizing that "Pennsylvania does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim," *Simmons v. Nationwide Mut. Fire Ins. Co*., 788 F. Supp.

2d 404, 409 (W.D. Pa. 2011), we note that the contract in this case specifically provided that if the parties could not agree upon the amount of damages attributable to the negligence of an under-insured motorist, "then the Insured shall . . . file a lawsuit in a state or federal court that has jurisdiction, against" State Farm. (Doc. 103-2, p. 44.).

This is precisely what happened here. The parties disagreed on the scope of recoverable damages. Accordingly, in full compliance with the terms of the insurance contract this disagreement has been brought to the courts for resolution. In sum, the actions taken here fully comply with the terms of the insurance contract itself. Since a common law contractual bad faith claim is "subsumed by the breach of contract claim. . . . because 'the actions forming the basis of the breach of contract claim are essentially the same actions forming the basis of the bad faith claim,'" *Tubman v. USAA Cas. Ins. Co.,* 943 F. Supp. 2d 525, 529 (E.D. Pa. 2013), the fact that this lawsuit is undertaken pursuant to the terms of this written contract fatally undermines any claim that this conduct is a bad faith derogation of contractual duties.

## IV.    <u>Conclusion</u>

In sum, even when we construe the evidence in a light most favorable to the plaintiff, we find that this evidence will not permit a conclusion that State Farm

breached its contractual duty of good faith in any way which would support an independent free-standing legal claim in this case, beyond the Plaintiff's damages claim that is pursued under the terms of the written contract itself. Therefore, the Defendant's motion for summary judgment on any free-standing contractual bad faith claim is GRANTED (Doc. 100) and this case will proceed to trial for the purpose of assessing damages pursuant to the contract between the parties, in accordance with the terms of that contract.

A separate order consistent with this memorandum opinion follows.

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge

Dated:   October 5, 2017